**RAG CUMBERLAND RESOURCES LP, Petitioner,**

v.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION and Secretary of Labor, Respondents.**

**No. 00–1438.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 2001.

Decided Dec. 7, 2001.

Ralph Henry Moore II argued the cause and filed the briefs for petitioner.

Harold P. Quinn, Jr. and Michael F. Duffy were on the brief for amicus curiae National Mining Association.

Robin A. Rosenbluth, Attorney, U.S. Department of Labor, argued the cause for respondents. With her on the brief was W. Christian Schumann, Counsel. John T. Sullivan, Attorney, Federal Mine Safety and Health Review Commission, entered an appearance.

Before: GARLAND, Circuit Judge, SILBERMAN and WILLIAMS,* Senior Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Petitioner RAG Cumberland Resources LP, the owner and operator of a coal mine, challenges an order issued against it pursuant to § 104(d)(2) of the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), 30 U.S.C. § 814(d)(2). The Secretary of Labor issued the order after a

---

* Senior Circuit Judge Williams was in regular active service at the time of oral argument.

federal mine inspector discovered that, for the second time in four months, the petitioner had violated a mandatory mine safety standard through conduct constituting more than ordinary negligence. RAG Cumberland does not deny that it committed those violations, but asserts that the Mine Act bars the Secretary from issuing the order because its mine passed a "clean inspection" during the period between the two violations. An administrative law judge (ALJ) for the Federal Mine Safety and Health Review Commission (FMSHRC or the "Commission") agreed with the petitioner and vacated the order. On discretionary review, the Commission set aside the ALJ's conclusion and reinstated the order. For the reasons set forth below, we deny RAG Cumberland's petition for review of the Commission's decision.

I

The Mine Act requires the Secretary of Labor to promulgate mandatory health and safety standards for the nation's mines. Mine Act § 101(a), 30 U.S.C. § 811(a). To ensure compliance with those standards, the Act requires representatives of the Secretary to inspect each underground mine "in its entirety" at least four times per year and to develop guidelines for conducting additional inspections as appropriate. Mine Act § 103(a), 30 U.S.C. § 813(a). The Mine Safety and Health Administration (MSHA) conducts these inspections on behalf of the Secretary.

Section 104 of the Mine Act, 30 U.S.C. § 814, directs the Secretary to issue citations and orders to mine operators who are not in compliance with the Act or the regulations promulgated thereunder. A MSHA inspector who discovers a violation of a mandatory health or safety standard must issue a *§ 104(a) citation* to the operator. The citation must describe the violation with particularity and fix a reasonable time for its abatement. 30 U.S.C. § 814(a).

Section 104(d) of the Act, 30 U.S.C. § 814(d), the principal section at issue here, creates a "chain" of increasingly severe sanctions for certain violations of mandatory standards. *Nacco Mining Co. v. Sec'y of Labor,* 9 F.M.S.H.R.C. 1541, 1545–46 (1987). If an inspector finds a violation of a mandatory standard that could "significantly and substantially" contribute to a mine safety or health hazard, and that was caused by an "unwarrantable failure" of the operator to comply with the standard,[1] MSHA issues what is commonly referred to as a *§ 104(d)(1) citation.* 30 U.S.C. § 814(d)(1); *see Sec'y of Labor v. Cyprus Cumberland Res. Corp.,* 21 F.M.S.H.R.C. 722, 725 (1999) ("*Commission Decision I*"). If, during the same inspection or any subsequent inspection within the next ninety days, an inspector discovers another violation of a mandatory standard caused by an unwarrantable failure to comply, MSHA issues a *§ 104(d)(1) withdrawal order*—also known as a "predicate order." *See Sec'y of Labor v. Wyoming Fuel Co.,* 16 F.M.S.H.R.C. 1618, 1622 n.7 (1994).[2] A withdrawal order requires the mine operator to remove all persons (except those needed to correct the problem) from the area until the violation has been corrected. 30 U.S.C. § 814(d)(1). When such an order is issued, production

---

1. An unwarrantable failure occurs when the violation is caused by "aggravated conduct constituting more than ordinary negligence." *Emery Mining Corp. v. Sec'y of Labor,* 9 F.M.S.H.R.C.1997, 2004 (1987).

2. "Unlike section 104(d)(1) citations, section 104(d)(1) withdrawal orders require no 'significantly and substantially' findings." *Sec'y of Labor v. FMSHRC,* 111 F.3d 913, 919 (D.C.Cir.1997).

in the affected area of the mine must cease.

Once a § 104(d)(1) withdrawal order has been issued, if "upon any subsequent inspection" an inspector finds a violation caused by an unwarrantable failure, the inspector issues a *§ 104(d)(2) withdrawal order*.[3] The chain of sanctions continues, with each new unwarrantable violation generating a § 104(d)(2) withdrawal order "until such time as *an inspection of such mine* discloses no similar violations." 30 U.S.C. § 814(d)(2) (emphasis added); *see United Mine Workers v. FMSHRC*, 768 F.2d 1477, 1478–79 (D.C.Cir.1985); *Nacco Mining Co.*, 9 F.M.S.H.R.C. at 1545.[4] The "inspection of such mine" necessary to end the sanctions chain is known as a "clean inspection." *See Sec'y of Labor v. Kitt Energy Corp.*, 6 F.M.S.H.R.C. 1596, 1596 (1984). To sustain a § 104(d)(2) withdrawal order, the Secretary has the burden of proving, by a preponderance of the evidence, that a clean inspection has not occurred since the issuance of the previous withdrawal order. *Id.* at 1600.

## II

RAG Cumberland owns and operates the Cumberland Mine, an underground bituminous coal mine near Waynesburg, Pennsylvania.[5] Each year, MSHA conducts four regular health and safety inspections of the entire Cumberland Mine. The inspections are conducted quarterly by two MSHA inspectors who are assigned to the mine on a full-time basis. An inspection usually takes a full quarter to complete. Other inspectors from MSHA's Waynesburg field office periodically visit the mine to assist the two full-time inspectors. *See Commission Decision I*, 21 F.M.S.H.R.C. at 723.

On June 18, 1997, during a regular quarterly inspection, a MSHA inspector issued the Cumberland Mine a § 104(d)(1) withdrawal order for a significant and substantial and unwarrantable violation of a mandatory safety standard. *Id.* On September 24, 1997, during the next quarterly inspection, the mine was issued a § 104(a) citation for a violation of MSHA's mandatory roof control standard. In response,

---

**3.** Unlike a § 104(d)(1) withdrawal order, which may only be issued within ninety days of its predicate § 104(d)(1) citation, a § 104(d)(2) withdrawal order may be issued within any period after its predicate § 104(d)(1) withdrawal order.

**4.** Section 104(d)(2) states:

If a withdrawal order with respect to any area in a . . . mine has been issued pursuant to [§ 104(d)(1)], a withdrawal order shall promptly be issued by an [inspector] who finds upon any subsequent inspection the existence in such mine of violations similar to those that resulted in the issuance of the withdrawal order under [§ 104(d)(1)] until such time as an inspection of such mine discloses no similar violations. Following an inspection of such mine which discloses no similar violations, the provisions of [§ 104(d)(1)] shall again be applicable to that mine.

30 U.S.C. § 814(d)(2). As used in § 104(d)(2), the term "similar violations" means other violations caused by unwarranta-

ble failures; they need not be substantively similar to the violation upon which the original order was based. *See* S.Rep. No. 95-181, at 32 (1977); *Greenwich Collieries v. Sec'y of Labor*, 12 F.M.S.H.R.C. 940, 945 (1990); *see also Int'l Union, United Mine Workers v. Kleppe*, 532 F.2d 1403, 1406–07 (D.C.Cir. 1976). In addition, a § 104(d)(2) withdrawal order, like a § 104(d)(1) withdrawal order, "may issue on the basis of 'unwarrantable failure' findings alone," without a finding that the violation was significant and substantial. *Sec'y of Labor v. FMSHRC*, 111 F.3d at 919.

**5.** At the time of the events in question, the mine was operated by Cyprus Cumberland Resources Corporation. RAG Cumberland is the new parent company of Cyprus and is the petitioner here. For purposes of clarity, in this opinion we will refer to RAG Cumberland as the entity against which the Secretary's enforcement action was taken.

the mine installed a hydraulic jack to support the roof, which temporarily abated the violation, and placed two warning signs in the area. The next day, however, the inspector discovered that the jack and signs had been removed and that miners had been working beneath the unsupported roof. This, he determined, constituted a significant and substantial and unwarrantable violation of the roof control standard. In light of the predicate June 18 order, MSHA issued RAG Cumberland a § 104(d)(2) withdrawal order on September 25. *Id.* at 724.

RAG Cumberland filed a challenge to the September 25 order with FMSHRC. The company stipulated to the validity of the June 18 predicate order, and further stipulated both that it had violated the roof control standard on September 25 and that the violation was significant and substantial and had been caused by an unwarrantable failure. The sole basis for RAG Cumberland's challenge was its contention that a § 104(d)(2) withdrawal order was unjustified because MSHA had conducted a clean inspection of the Cumberland Mine during the period between June 18 and September 25. The Secretary, in turn, stipulated that MSHA had, in fact, thoroughly inspected all areas of the mine between those dates—with the exception of the 60 West Mains haulage, a 4200-foot passage that serves as the primary route into and out of the mine. Thus, the only question affecting the validity of the September 25 order was whether MSHA had conducted a clean inspection of the 60 West Mains haulage itself between June 18 and September 25. *Id.*

RAG Cumberland's challenge to MSHA's September 25 withdrawal order made two complete trips through the FMSHRC adjudicatory process before arriving at this court. The challenge was initially heard before an ALJ, who concluded that MSHA had conducted an inter-vening clean inspection of the haulage and therefore downgraded the § 104(d)(2) withdrawal order to a § 104(d)(1) citation. *Cyprus Cumberland Res. Corp. v. Sec'y of Labor,* 20 F.M.S.H.R.C. 285, 295 (1998) ("*ALJ Decision I*"). The ALJ based his conclusion on the Secretary's stipulation that, during the relevant period, MSHA inspectors traveled through the 60 West Mains haulage "many times," in both open and closed vehicles, en route to conduct inspections in other areas of the mine. *Id.* at 294. The ALJ disagreed with the Secretary's view that such travel was insufficient to constitute a clean "inspection of such mine" within the meaning of § 104(d)(2). The ALJ did not dispute the reasonableness of the Secretary's statutory interpretation: that to constitute an "inspection," inspectors must leave their vehicles and conduct a detailed examination for non-obvious hazards. *Id.* at 289. Rather, he simply "decline[d] to defer to the Secretary's interpretation," *id.,* holding instead that the inspectors' "opportunity to observe" the mine's conditions was enough to represent a clean inspection under the Act, *id.* at 294.

On discretionary review, the Commission vacated the ALJ's decision. It concluded that the ALJ had erred in relying on the inspectors' repeated travel through the haulage, rather than examining evidence of actual inspection activity. *Commission Decision I*, 21 F.M.S.H.R.C. at 727. The Commission explained that under controlling precedent, the physical presence of an inspector in each area of the mine is insufficient to constitute a clean inspection. To the contrary, such an inspection requires inspectors to conduct a "thorough and complete" examination for all potential hazards, not only those that are visible or obvious. *Id.* at 726. Since RAG Cumberland's own safety manager had conceded "that an inspector would have to stop and exit the vehicle in order

to inspect a number of conditions," *id.* at 727 n. 6 (citing ALJ Hr'g Tr. at 772, 818, 827–29, 844–48),[6] the Commission rejected the ALJ's premise that the inspectors' vehicular travel constituted a clean inspection of the 60 West Mains haulage. It therefore remanded the case to the ALJ to determine whether the Secretary had met her burden of establishing the absence of a clean inspection, "by examining evidence regarding any inspection activity in the haulage area during the time period in question." *Id.* at 728. The Commission specifically instructed the ALJ to examine a log, maintained by the mine operator, that depicted all inspection activity in the mine. *Id.*

On remand, the ALJ again converted the § 104(d)(2) withdrawal order to a § 104(d)(1) citation. *Cyprus Cumberland Res. Corp. v. Sec'y of Labor,* 21 F.M.S.H.R.C. 1112, 1118 (1999) ("*ALJ Decision II*"). The ALJ noted that, during their many trips through the haulage, the inspectors had "an opportunity, if not an obligation, to repeatedly observe the roof, rib and track conditions," and that they "could have left their battery operated vehicles at any time if they had observed any hazardous or violative condition." *Id.* at 1113. "The Secretary cannot prevail," the ALJ said, "simply by establishing that inspectors had not exited their battery operated vehicles to inspect electrical boxes located in the 60 Mains." *Id.* at 1115. Rather, the ALJ held, the decisive question was whether a "reasonable person ... would conclude" that the inspectors' observations during their trips through the haulage "constitute[d] an adequate inspection for hazardous conditions." *Id.* at

1116. Applying this "reasonable person test," the ALJ held that it would be "unreasonable to conclude" that the inspectors had not conducted a clean inspection. *Id.*

Once again, the Commission reversed. *Sec'y of Labor v. RAG Cumberland Res. Corp.,* 22 F.M.S.H.R.C. 1066 (2000) ("*Commission Decision II*"). The Commission held that an actual, "thorough and complete" inspection—not the mere opportunity to observe visible hazards—is required to sever the chain of sanctions. *Id.* at 1072. Applying that standard to the facts of record, the Commission reinstated the Secretary's § 104(d)(2) withdrawal order. *Id.*

### III

The Federal Mine Safety and Health Review Commission adjudicates disputes arising under the Mine Act, including challenges by mine operators to citations and orders issued by the Secretary of Labor pursuant to § 104. *See* Mine Act § 113, 30 U.S.C. § 823. Under the statutory scheme, the Commission is required to accord deference to " 'the Secretary's interpretations of the law and regulations.' " *Sec'y of Labor v. Cannelton Indus., Inc.,* 867 F.2d 1432, 1435 (D.C.Cir. 1989) (quoting S.REP. No. 95-181, at 49 (1977), 1977 U.S.Code Cong. & Admin.News 3401, 3448). And while it may reverse a decision by an ALJ for legal error, the Commission must uphold an ALJ's factual determinations if they are supported by substantial evidence. *See Donovan ex rel. Chacon v. Phelps Dodge Corp.,* 709 F.2d 86, 90–91 (D.C.Cir.1983) (interpreting 30 U.S.C. § 823(d)(2)).[7]

---

6. Those included "electrical installations, fire fighting equipment, roof and rib conditions, ventilation, and the condition of the track." *Id.*

7. In this regard, administrative review under the Mine Act is unlike that under the Administrative Procedure Act, 5 U.S.C. § 557(b), which ordinarily "empowers agencies to make independent factual findings on the basis of a record developed by an ALJ." *Donovan,* 709 F.2d at 91.

Any person adversely affected by a Commission order may petition to this court for review. Mine Act § 106(a), 30 U.S.C. § 816(a). Like the Commission, we are required to accord deference to the Secretary's reasonable interpretations of the language of the Mine Act. *See Cannelton*, 867 F.2d at 1435 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).[8] When the Secretary and the Commission divide, we must defer to the Secretary. *See id.; see also Sec'y of Labor v. FMSHRC*, 111 F.3d 913, 920 (D.C.Cir.1997); *cf. Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 152–53, 111 S.Ct. 1171, 1176–77, 113 L.Ed.2d 117 (1991) (holding that, under a similar split-enforcement scheme, court must defer to the interpretation of the Secretary of Labor rather than to that of OSHRC).[9] Where, as here, the Secretary and the Commission agree, there is no question but that we must accord deference to their joint view. *See Energy West Mining Co. v. FMSHRC*, 111 F.3d 900, 903 (D.C.Cir.1997); *Emerald Mines Co. v.*

*FMSHRC*, 863 F.2d 51, 54 (D.C.Cir.1988). Finally, we are required to uphold the Commission's factual findings "if supported by substantial evidence on the record considered as a whole." Mine Act § 106(a)(1), 30 U.S.C. § 816(a)(1).[10]

RAG Cumberland contends that, in reversing the ALJ's conclusion regarding the occurrence of a clean inspection, the Commission exceeded its statutorily prescribed standard of review. The Commission did this, petitioner asserts, by reweighing the evidence before the ALJ rather than upholding factual determinations that were supported by substantial evidence. *See Donovan*, 709 F.2d at 92 (holding that, under the Mine Act, the Commission may not "substitute a competing view of the facts for the view the ALJ reasonably reached"). We disagree. The Commission did not reverse the ALJ because it weighed the record evidence differently than he did. Instead, the Commission reversed because the ALJ applied a legally erroneous interpretation of the clean inspection standard to the record facts, and because it was clear that under the correct

8. Of course, "the Secretary, the Commission, and this court ... 'must give effect to the unambiguously expressed intent of Congress.' " *Cannelton*, 867 F.2d at 1435 (citing *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781). But the Mine Act is silent with respect to what constitutes the "inspection" required to break the chain of § 104(d)(2) sanctions.

9. *Cf. also Martin*, 499 U.S. at 157, 111 S.Ct. at 1179 (holding that "the Secretary's litigating position before [OSHRC] is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard," and that "the Secretary's interpretation is not undeserving of deference merely because the Secretary advances it for the first time in an administrative adjudication").

10. As discussed above, although it may reverse an ALJ's decision for legal error, the Commission must uphold an ALJ's factual determinations if they are supported by sub-

stantial evidence. *Donovan*, 709 F.2d at 90. Because in this case we conclude that the Commission properly vacated the ALJ's decision for legal error, we need not consider the precise standard of review we would apply to a Commission decision reversing an ALJ's findings of fact. *Cf. Burns v. Director, Office of Workers' Compensation Programs*, 41 F.3d 1555, 1562 (D.C.Cir.1994) (holding that, on a petition for review of a decision by the Benefits Review Board under the split enforcement scheme of the Longshore and Harbor Workers' Compensation Act, rather than defer to the Board the court must "conduct an independent review of the record to determine if the ALJ's findings are supported by substantial evidence") (internal quotation marks omitted); *id.* at 1565 (Silberman, J., concurring) (observing the anomaly of a court independently reviewing the record, but noting uncertainty as to whether "any different scope of review[ ] is even theoretically available to a court of appeals under this statute").

standard those facts established the absence of a clean inspection. We uphold the Commission's decision on both counts.

## A

■ In its review of the ALJ's initial decision, the Commission determined that he misapplied the law by holding that the inspectors' repeated travel through the 60 West Mains haulage was sufficient to establish a clean inspection. The Commission remanded, instructing the ALJ to consider the record evidence regarding actual inspection activity in the haulage, including RAG Cumberland's inspection log, in order to determine whether the Secretary had met her burden of proving that a thorough and complete inspection had not occurred. *Commission Decision I*, 21 F.M.S.H.R.C. at 727–28. In reviewing the ALJ's decision on remand, the Commission determined that he failed to comply with its instructions to consider "the record evidence regarding inspections in the haulage." *Commission Decision II*, 22 F.M.S.H.R.C. at 1071. "Rather," the Commission said, "the judge applied the 'reasonable person test'" to determine whether a clean inspection had occurred. *Id.*

The ALJ described the "reasonable person test" he thought applicable to this case as follows:

> The question is whether a reasonable person, familiar with the deterrent purposes of section 104(d)(2) with respect to unwarrantable failure, would conclude that the numerous mine inspectors' observations (during approximately 135 round trips) of the 60 West Mains haulage ribs, roof, and track, constitute an adequate inspection....

*ALJ Decision II*, 21 F.M.S.H.R.C. at 1116. The Commission rightly rejected that test as legally erroneous. Congress did not delegate the authority to determine the meaning of a statutory term like "inspec-

tion" to a theoretical reasonable person. To the contrary, as we noted above, Congress intended the Secretary of Labor to interpret the terms of the Mine Act. *See Cannelton*, 867 F.2d at 1435 (citing S.REP. No. 95-181, at 49). And ALJs, the Commission, and this court are all bound to defer to the Secretary's interpretations—provided, of course, that they are reasonable. *Id.*

The Commission also rejected the definition of a clean inspection that the ALJ apparently thought a reasonable person would adopt. The ALJ noted that the "inspectors *could have* left their vehicles at any time if they had observed any conditions that caused concern," suggesting that the opportunity to examine visible hazards was sufficient even if there was no evidence that the inspectors had done so. *ALJ Decision II*, 21 F.M.S.H.R.C. at 1113 (emphasis added). Moreover, the ALJ held that the Secretary "cannot prevail simply by establishing that inspectors *had not* exited their battery operated vehicles to inspect electrical boxes located in the 60 Mains," suggesting that the inspection of non-visible hazards (e.g., ones that could only be determined by opening electrical boxes) was not required. *Id.* at 1115 (emphasis added).

The Commission rejected these views, agreeing with the Secretary that a clean inspection requires a "thorough and complete" inspection for violations of any kind, "obvious or otherwise." *See Commission Decision II*, 22 F.M.S.H.R.C. at 1072; *id.* at 1069 (stating the Secretary's position); *see also Commission Decision I*, 21 F.M.S.H.R.C. at 726 (citing *Eastern Associated Coal Corp.*, 3 I.B.M.A. 331, 357–58, 81 Interior Dec. 567, 579–80 (Bd. Mine Op.App.1974) (holding that, under the same language in the predecessor to the Mine Act, a clean inspection required a "thorough examination of conditions and practices throughout a mine")). The Com-

mission also agreed with the Secretary that the *opportunity* to conduct such an inspection is not alone sufficient. And the Commission further emphasized that "mere travel through an area of the mine, without evidence of a thorough and complete inspection, does not suffice to support a finding that a clean inspection occurred." *Commission Decision II*, 22 F.M.S.H.R.C. at 1073. Accordingly, the Commission held, evidence of actual "inspection activity in the haulage area during the relevant time period must be considered" in order to decide the instant case. *Id.*

The Commission's ruling constitutes a reasonable interpretation of the statutory phrase "inspection of such mine" in § 104(d)(2), and hence one to which we must defer. Indeed, we would be hard pressed to decide otherwise, since the Commission expressly rested its interpretation on a prior decision of this court. *See id.* at 1072–74 (citing *United Mine Workers v. FMSHRC*, 768 F.2d 1477 (D.C.Cir.1985)). As the Commission accurately observed, in *United Mine Workers* we rejected the notion that "an inspector's physical presence in each area of the mine—regardless of the object of the inspection or the hazards actually examined for in each particular area—qualifies as an intervening 'clean' inspection." 768 F.2d at 1479. "The only rational reading of the intervening 'clean' inspection requirement," we held, "is that all areas of a mine must be inspected for all hazards," both the "unseen" and the "visible." *Id.* at 1480. In fact, contrary to the very example used by the ALJ here, we suggested that in order to conduct a clean inspection, an inspector must "open an electrical junc-

tion box to see whether the wiring inside is safe." *Id.* at 1479–80.[11]

Notwithstanding the previously expressed views of both the Secretary and this court, RAG Cumberland challenges the validity of the Commission's conclusion that a clean inspection requires an examination for non-obvious hazards, arguing that there is evidence that MSHA inspectors do not always inspect as thoroughly as this view of the statute requires. Lax inspection practices in the field, however, cannot trump the views of the Secretary of Labor and the Commission. *Cf. Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C.Cir.1998) (explaining that "deference is owed to the decisionmaker authorized to speak on behalf of the agency, not to each individual agency employee"). We therefore hold that the Commission properly vacated the ALJ's decision as based on a legally erroneous definition of the requirements of a clean inspection under § 104(d)(2) of the Mine Act.

### B

Having vacated the ALJ's erroneous view of the law, the Commission examined the record evidence regarding actual inspection activity in the 60 West Mains haulage, and, based on that evidence, reinstated the Secretary's § 104(d)(2) withdrawal order. *Commission Decision II*, 22 F.M.S.H.R.C. at 1073–75. Although the Commission may not "substitute a competing view of the facts for the view the ALJ reasonably reached," *Donovan*, 709 F.2d at 92, it may apply the law to the facts in the record and "modify the decision or order of the administrative law judge in conformity with the record." Mine Act § 113(d)(2)(C), 30 U.S.C. § 823(d)(2)(C).[12]

---

11. As another example, we observed that to "determine whether there are unsafe concentrations of gases or dust an inspector must employ special monitoring equipment." *Id.* at 1479.

12. Under § 113(d)(2)(C) of the Mine Act, the Commission must remand the case to the ALJ only if it "determines that further evidence is necessary on an issue of fact." 30 U.S.C. § 823(d)(2)(C); *see Walker Stone Co. v. Sec'y*

If supported by substantial evidence, the Commission's findings are conclusive upon this court. Mine Act § 106(a)(1), 30 U.S.C. § 816(a)(1).

In deciding that there had not been an intervening clean inspection at the Cumberland Mine, the Commission relied on two categories of evidence: the testimony of two of the fulltime MSHA inspectors responsible for quarterly inspections of the mine and a log tracking actual inspection activity at the mine. The two inspectors testified that they did not conduct an inspection of the haulage between June 18 and September 25, 1997. ALJ Hr'g Tr. 287–88, 476, 501. As one of the inspectors put it, "I didn't stop and I didn't do the things necessary to inspect the haulage. I just traveled across it." *Id.* at 288 (quoted in *Commission Decision II*, 22 F.M.S.H.R.C. at 1074). RAG Cumberland maintains that this testimony is inconclusive because it fails to prove that *no* inspector conducted a clean inspection. But the Commission properly rejected the contention that, to meet her burden of proof, the Secretary must submit evidence from every inspector who traveled through the haulage. *Commission Decision II*, 22 F.M.S.H.R.C. at 1070. As the Commission pointed out, when it originally placed the burden of proving the absence of a clean inspection on the Secretary, it also made clear that to carry this burden the Secretary "need not prove a negative." *Id.* (citing *Kitt Energy Corp.*, 6 F.M.S.H.R.C. at 1600).

The Commission's precedent also provides that, to show the absence of a clean inspection, the Secretary may rely upon inspection records for the period in question. *See Kitt Energy Corp.*, 6 F.M.S.H.R.C. at 1600. Here, the mine operator kept a log, which the Commission found and the record confirms documents all inspection activity in the mine during the relevant period. *See Commission Decision I*, 21 F.M.S.H.R.C. at 728. "Of special significance," the Commission said, was "the [ALJ's] finding, which is undisputed on review, that the log entries do not indicate that any regular or spot inspections took place in the 60 West Mains" haulage between June 18 and September 25. *Commission Decision II*, 22 F.M.S.H.R.C. at 1073 (citing *ALJ Decision II*, 21 F.M.S.H.R.C. at 1114). We agree that the absence of a log reference to any inspections in the haulage is strong evidence that the area was not inspected.

Contrary to RAG Cumberland's contention, the fact that the mine operator rather than the Secretary initially introduced the log into evidence does not mean that it cannot be used to support a finding in favor of the Secretary. *See Burroughs Corp. v. Rocky Mountain Prestress, Inc.*, 431 F.2d 1185, 1187 (10th Cir.1970). Nor does it make the log any less probative. If anything, the fact that the mine operator itself maintained the log makes it even more probative, because the operator had every incentive to list particular areas as having been inspected in order to break the chain of § 104(d)(2) sanctions.[13]

---

*of Labor*, 156 F.3d 1076, 1085 n. 6 (10th Cir.1998) (holding remand unnecessary where the "essential facts were not in dispute"); *Sellersburg Stone Co. v. FMSHRC*, 736 F.2d 1147, 1153 (7th Cir.1984) (holding remand not required "[g]iven the Commission's conclusion that uncontroverted evidence did not warrant further factual findings").

13. RAG Cumberland also contends that the log does not document areas that were in-

spected, but instead merely indicates an inspector's ultimate destination on a particular day. The ALJ did not make such a finding, and the company's characterization is contradicted by the record. In addition to testimony by a Cumberland employee that the log tracks the areas of the mine that were inspected, ALJ Hr'g Tr. 774–75, the caption of the relevant column of the log reads "area inspected"—not "area traveled to." J.A. at 59.

In sum, RAG Cumberland's log of inspection activity, together with the testimony of the MSHA inspectors, provides substantial evidence for the Commission's conclusion that a clean inspection of the 60 West Mains haulage did not occur prior to the issuance of the September 25 withdrawal order.

### IV

Because the Commission adopted an appropriate standard for determining whether there was a clean inspection of the 60 West Mains haulage, and because substantial evidence in the record supports the Commission's decision to reinstate the Secretary's § 104(d)(2) withdrawal order under that standard, the petition for review is

*Denied.*