# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued May 9, 2005            Decided July 12, 2005

No. 02-1374

SOUTHERN CALIFORNIA EDISON COMPANY AND
PACIFIC GAS AND ELECTRIC COMPANY,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SAN DIEGO GAS & ELECTRIC COMPANY, ET AL.,
INTERVENORS

―――――

Consolidated with
02-1376, 02-1381, 02-1385, 02-1388

―――――

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

―――――

*Nicholas W. Fels* argued the cause for Utility Petitioners. With him on the briefs were *Mark D. Patrizio*, *Stuart K. Gardiner*, *Carolyn F. Corwin*, *Stuart J. Evans*, *E. Gregory Barnes*, *Jennifer L. Key*, and *Michael D. Mackness*.

*Harvey L. Reiter* argued the cause for petitioners Sacramento Municipal Utility District, et al. With him on the briefs were *Glen L. Ortman*, *Wallace L. Duncan*, *James D. Pembroke*, *Michael Postar*, and *Sean M. Neal*.

*Anthony J. Ivancovich*, *J. Phillip Jordan*, and *Michael E. Ward* were on the brief for intervenor California Independent System Operator Corporation in support of petitioners.

*Dennis Lane*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Cynthia A. Marlette*, General Counsel.

Before: GINSBURG, *Chief Judge*, and SENTELLE and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: The Federal Energy Regulatory Commission ("FERC" or "the Commission") in the order before us disallowed tariff provisions proposed by Southern California Edison, Pacific Gas & Electric, and San Diego Gas & Electric ("Utility Petitioners," transmission operators, or "TOs") in which Utility Petitioners had proposed a rate designed to recover from two classes of customers cost differentials from additional expenses arising out of the formation and maintenance of an independent system operator ("ISO"). Utility Petitioners proposed a tariff term passing costs through both to customers under existing contracts and to new customers. FERC disallowed the pass-through as to the new customers. Both the Utility Petitioners and municipal customers (customers under pre-existing contracts) petition for review, challenging the FERC decision as arbitrary and capricious in violation of section 706 of the Administrative Procedure Act ("APA"). Because the order by FERC contravenes the explicit language of the FERC-

approved ISO tariff schedule to which the tariffs must conform, we find the order to have been arbitrary and capricious and grant the petitions for review.

## I. Background

A. *Creation of ISO Tariff Schedule*

In March 1998, as part of a FERC-instigated restructuring of the California energy system, Utility Petitioners transferred control over their electricity transmission to the newly formed California ISO. (For background on the formation of ISOs in general, and this ISO in particular, *see California Independent System Operator Corp. v. FERC*, 372 F.3d 395, 396-97 (D.C. Cir. 2004)). When they merged into the ISO, Utility Petitioners retained obligations to provide transmission to existing wholesale customers under pre-existing contracts. *See* FERC Electric Tariff, original vol. 1 of Cal. Ind. Sys. Operator Corp. § 2.4.3.1 ("ISO Tariff") (providing that existing contracts should be honored such that, "to the extent possible, [doing so] imposes no additional financial burden on either the Participating TO or the contract rights holder . . . ."). But at the same time, according to Utility Petitioners, they faced higher costs from the ISO–in the form of transmission losses and ancillary service requirements[1]–than those they could recover under existing contracts with their wholesale customers.

---

[1]According to the Utility Petitioners, "transmission losses" are the small portion of energy that is lost "when electricity is scheduled over transmission lines . . . due principally to electrical resistance of the conductors transmitting the energy from generators to consumers" and "ancillary services" means "the maintenance of generation at various stages of readiness . . . in order to assure the continued reliability of the grid."

Just before the ISO went into operation, FERC approved the final version of the ISO Tariff agreed to by the various parties to the restructuring that established a roadmap governing the operation of the ISO, including principles governing the individual TO Tariffs that Utility Petitioners could charge to their customers. During the process of negotiating this agreement, Utility Petitioners asked that a provision be included to allow them to recover the excess transmission and ancillary service provision costs. This was done in section 7.1 of a revised version of the ISO Tariff, issued in August 1997, which called for including a "Transmission Revenue Credit" in the Access Charge to be collected by the ISO on behalf of the TOs; the definition of "Transmission Revenue Credit" was revised to include "the shortfall or surplus resulting from any cost differences between Transmission Losses and Ancillary Service requirements associated with Existing Rights or Non-Converted Rights and the ISO's rules and protocols." ISO Tariff, Master Definitions Supplement, original sheet no. 350. Further, after and pursuant to an October 30, 1997 FERC Order providing interim and conditional authorization to the ISO to start operations, *Pacific Gas & Electric Co. et al, Order Conditionally Authorizing Limited Operation of an Independent System Operator and Power Exchange*, 81 FERC 61,122 ("October 1997 Order"), the ISO submitted a revision to the language of section 2.4.4.4.4.5, which provided that the ISO "will provide the parties to the Existing Contracts with details of its Transmission Losses and Ancillary Services calculations to . . . enable the parties to the Existing Contracts to settle the differences bilaterally or *through the relevant TO Tariff*." ISO Tariff § 2.4.4.4.4.5 (emphasis added).

FERC accepted the ISO's proposed Access Charge, including the revised definition of "Transmission Revenue Credit" in its order of October 30, 1997. It accepted the proposed revision to the language of section 2.4.4.4.4.5 "for

filing . . . to become effective on the date that ISO operations commence" in December 1997. *Order Conditionally Accepting for Filing Certain Pro Forma Agreements*, 81 FERC 61,322, 62,477 (Dec. 17, 1997). Utility Petitioners argue that, under this final version of the ISO Tariff, they would be permitted to recover the cost differentials either (a) by bilaterally negotiating with existing contract holders, or (b) by adding them to the Access Charge (through the Transmission Revenue Credit) charged by the ISO to the TOs' new customers,[2] paying ISO tariff rates.

B. *Administrative Proceedings*

After the above-described negotiations were complete, FERC set the individual TO Tariffs for administrative hearings, as required by FPA § 205(e), 16 U.S.C. § 824d(e) ("Whenever any new schedule is filed the Commission shall have authority, . . . to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service."). In a consolidated hearing addressing the proposed TO Tariffs of all three Utility Petitioners, the administrative law judge ("ALJ") decided that, despite the above-cited language of the ISO Tariff, the cost differentials could *not* be passed on to the TO's tariff customers via the Transmission Revenue Credit in the Access Charge, holding that such a pass-through would amount to impermissible cross-subsidization. *Pacific Gas & Electric Co.*, *Initial Decision*, 88 FERC 63,007, 65,051 (Sept. 1, 1999). Specifically, the ALJ noted, "[a]ll other [TO] customers [aside from the existing contract holders] would be responsible for costs incurred on their own behalf as well as those incurred on behalf

---

[2]The term "new customers" includes all customers taking service under contracts entered after the assumption of service by the ISO, without regard to whether a particular customer may have previously had service under some preexisting contract.

of the Existing Contract customers." *Id.* To make up the cost differentials, the ALJ concluded, Utility Petitioners must either (a) reform their contracts with existing contract holders, to the extent permitted by those contracts and upon completion of a FPA § 205 or FPA § 206 filing, or (b) "shoulder th[e] cost burden" themselves, given that "they accepted the risk of potential cost increases at the time they negotiated the Existing Contracts." *Id.* at 65,052.

Both Utility Petitioners and Municipal Petitioners filed exceptions to the ALJ's decision to the Commission. FERC affirmed, holding that the definition of Transmission Credit Revenue in the ISO Tariff did *not* control, and that the language concerning reforming existing contracts in section 2.4.3.1 was "essentially precatory." *Pacific Gas & Electric Co. et al, Opinion No. 458, Opinion and Order Affirming Initial Decision*, 100 FERC 61,156, 61,573-74 (August 5, 2002) ("Order 458"). FERC further held that the ALJ had correctly read the ISO Tariff to require Utility Petitioners to recover the cost differential by reforming existing contracts (or else absorb the costs themselves), because "the costs are associated with service provided under the existing contracts, not the TO Tariffs . . . ." *Id.* at 61,574.

Utility Petitioners and Municipal Petitioners sought rehearing. FERC affirmed its prior conclusion, along with its justifications. *See Pacific Gas & Electric Co. et al, Opinion 458-A, Order Denying Rehearing, Granting Clarification and Approving Partial Settlement*, 101 FERC 61,151, 61,620 ("Order 458-A"). At this point, FERC added new justifications for its affirmation of the ALJ's decision: First, FERC noted that although the ISO Tariff defined Transmission Revenue Credit to include the cost differential (and thus seemingly provided for the ISO to collect the cost differential from the new customers as part of the Access Charge), the definition "merely provided

that the ISO will assess these costs to the [TOs], but says nothing about what the [TOs] can do to recover these costs." *Id.* at 61,621. Second, despite the fact that the October 1997 Order revised section 2.4.4.4.4.5 as set forth above, FERC averred it had not "sp[oken] to the issue in this case in the October 1997 Order." *Id*. at 61,623. Instead, it said that all it had done was provide that "' . . . the ISO will establish a mechanism acceptable to the [TO] to roll any shortfall or surplus into the ISO rates applicable to that Transmission Owner.'" *Id.* (quoting October 1997 Order at 61,464 n.145). FERC went on: "This language does not, and was not intended to, explain the next step in the process–how the TOs would recover the costs from their customers."

C. *Current Petitions*

Both Utility Petitioners and Municipal Petitioners petition this court for review of Orders 458 and 458-A. Utility Petitioners argue that FERC's ruling that they may not recover the cost differentials through their TO Tariffs is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), insofar as it ignores or misconstrues the plain language of sections 2.4.4.4.4.5 and 7.1 of the ISO Tariff, and relies instead on the ALJ's "irrelevant" assertion that to allow otherwise would shift costs from the existing contract holders to the TO Tariff customers. Municipal Petitioners argue that it was arbitrary and capricious for FERC to uphold the ALJ's decision, because (a) it ignored the ISO Tariff provisions that allowed for recovery of the cost differentials through the TO Tariffs, and (b) FERC "neither explains the basis for its subsidization finding nor addresses Municipal Petitioners' arguments that cost causation principles require the opposite conclusion," i.e., that the existing contract holders were *not* responsible for the cost differentials. Mun. Pet. Br. at 16.

After Petitioners filed their petitions in December 2002, FERC asked for a voluntary remand of the record so that it could consider the issues further. The Commission issued an order on remand in May 2004, noting that it had mistakenly stated that the ISO Tariff language established the rate the ISO collects from (rather than for) the TOs. *Order on Remand*, 107 FERC 61,115 (May 6, 2004) (referring to language in Opinion No. 458-A at 61,621, mentioned above, in which FERC states that the definition of Transmission Revenue Credit "merely provided that the ISO will assess these costs to the [TOs], but says nothing about what the [TOs] can do to recover these costs.") However, FERC maintains that that error did not affect its basic conclusions.

We have jurisdiction under 16 U.S.C. § 825*l*(b). *See, e.g.*, *In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004). Because we conclude that FERC cannot disregard the definition of Transmission Revenue Credit that it approved and included in the ISO Tariff when considering later TO Tariff filings by TOs seeking to conform to that tariff, we grant the petitions for review.

## II. Discussion

In the tariff context, this Court generally "gives substantial deference to [FERC's] interpretation of filed tariffs, even where the issue simply involves the proper construction of language." *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814 (D.C. Cir. 1998) (internal quotation marks omitted). But, "[i]f the tariff's language is unambiguous, this court need not defer to FERC's interpretation." *Idaho Power v. FERC*, 312 F.3d 454, 461 (D.C. Cir. 2002).

The language of the ISO Tariff at issue in this case is clear. Section 2.4.4.4.4.5 of the ISO Tariff is permissive, allowing for

the recovery of cost differentials through the TO Tariffs, as well as through bilateral negotiations to reform existing contracts. The provision for the collection of a Transmission Revenue Credit as part of the Access Charge in section 7.1, combined with the definition of Transmission Revenue Credit, creates an explicit accounting mechanism for the ISO to recover the cost differentials through the TO Tariff on the TOs' behalf. Thus, Utility Petitioners are correct that the ISO Tariff allows them to recover the cost differentials associated with the formation of the ISO through their individual TO Tariffs.

FERC's primary argument in support of its decision to uphold the ALJ's decision disregarding the plain meaning of these provisions of the ISO Tariff is that the ISO Tariff is not controlling. But FERC can only support this argument with its own statements in the administrative proceedings below: (1) That the main purpose of those proceedings was to determine whether the TO tariff on the table was just and reasonable, as called for by FPA § 205(e); and (2) that it had made clear that the Access Charges (which include the Transmission Revenue Credit) were to be evaluated in individual tariff proceedings. However, to hold an individual TO Tariff that conforms to the ISO Tariff unjust and unreasonable would be to render section 7.1 and the definition of Transmission Revenue Credit nullities. This we can not do. *See, e.g., Secretary of Labor v. Twentymile Coal Company,* 2005 U.S. App. LEXIS 10797 at *11, Case Nos. 04-1292 & 04-1312 (D.C. Cir., June 10, 2005) (rejecting agency's interpretation of a regulation as "particularly untenable because it would render the pertinent regulation a nullity.") (emphasis removed).

FERC also argues, somewhat puzzlingly but consistent with its statements in the Remand Order, that the ISO Tariff provisions "leave[] open the question of who should pay the cost differentials." Govt. Br. at 26. In so arguing, FERC undermines

its own position–that the TOs cannot recover the cost differentials through the TO Tariffs–when it notes that "the Commission responded to that position by concluding recovery through the TO Tariff is not the *sole* option," and "recognize[d] the TO Tariff as *an* option." Govt. Br. at 29 (emphases in original).

Further, FERC argues that despite the plain text of the ISO Tariff, the "cost causation principle" dictated shifting the burden entirely over to the existing contract holders. Because FERC has already approved the mechanism in the ISO Tariff for collecting the cost differentials from the tariff customers, and cannot retroactively reverse that determination in considering individual TO Tariff filings, no argument concerning cost causation, regardless of how compelling, would permit the Commission to disregard the approved ISO Tariff. Should the Commission upon further reflection consider that mechanism to violate the cost causation principle, perhaps it may initiate proceedings to change the ISO Tariff prospectively, but that is not the case before us.

Thus, all of FERC's counter-arguments fall away, leaving us with the simple conclusion that FERC must follow its own roadmap enunciated in the ISO Tariff, and, in rate proceedings, affirm individual TO Tariffs that conform their rate design to the ISO Tariff. FERC may not, as FERC staff asserted and the ALJ agreed, "order modification of [Utility Petitioners'] TO Tariffs irrespective of any inconsistencies that such an order might create with the collective ISO Tariff." *Initial Decision*, 88 FERC at 65,051.

If FERC decided, after it began to look at the individual TO Tariffs, that allowing Utility Petitioners to include the cost differentials associated with the formation of the California ISO in the Access Charge collected from the new customers through

the Transmission Revenue Credit mechanism was unjust and unreasonable cross-subsidization, the proper course of action was to revise sections 2.4.4.4.4.5 and 7.1 of the ISO Tariff, including the definition of Transmission Revenue Credit also contained therein, as it is empowered to do under FPA § 206, 16 U.S.C. § 824e.

More generally, of course, agencies may alter regulations. Agencies may even alter their own regulations sua sponte, in the absence of complaints, provided they have sufficient reason to do so and follow applicable procedures. *See NRDC v. EPA*, 859 F.2d 156 (D.C. Cir. 1988); *see also Dana Corp. v. ICC*, 703 F.2d 1297, 1305 (D.C. Cir. 1983) ("[T]he agency is entitled to have second thoughts, and to sustain action which it considers in the public interest upon whatever basis more mature reflection suggests."). But agencies may not keep regulations in place and then disregard them in order to disapprove actions taken by regulated entities to conform with those regulations. Doing so is perhaps the essence of "arbitrary and capricious."

Having so concluded, we need not reach the issue of whether FERC was arbitrary and capricious in assigning blame for the cost differentials to the Municipal Petitioners.

### III. Conclusion

In sum, FERC acted arbitrarily and capriciously in upholding the ALJ's *Initial Decision* that disregarded the plain language of sections 2.4.4.4.4.5 and 7.1 of the ISO Tariff, and the definition of Transmission Revenue Credit contained therein. Opinions 458 and 458-A are vacated, and the case remanded for further proceedings consistent with the ISO Tariff.

*So ordered.*